# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# MONROE DIVISION

| | | |
|---|---|---|
| **TERRY R. LEWIS** | * | **CIVIL ACTION NO.  07-0092** |
| **VERSUS** | * | **JUDGE JAMES** |
| **CITY OF RUSTON, LOUISIANA, ET AL.** | * | **MAGISTRATE JUDGE HAYES** |

## REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge is a motion for summary judgment [doc # 23] filed by defendants, City of Ruston and Mayor Dan Hollingsworth.  The district court referred the motion to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). (*See*, December 21, 2007, Electronic Order).  For reasons stated below, it is recommended that the motion for summary judgment [doc. # 23] be **GRANTED IN PART** and **DENIED IN PART**.

## Procedural History

Terry R. Lewis, a black male, is a 27+ year veteran of the Ruston Fire Department ("RFD").[1]  Since 1994, Lewis has been the Training Officer for the RFD.  *Id*.[2]  On September 24, 2004, the former chief of the RFD, Donnie Watson, retired, and Ruston Mayor, Dan Hollingsworth, selected James Tornabene, a white male, to fill the position.  (Affidavit of Dan Hollingsworth, Def. Exh. 10).

---

[1]  Application for Competitive Examination, Pl. Exh. J.  Unless otherwise noted, exhibits reference attachments to the parties' respective memoranda.

[2]  Although the Civil Service title for his position is "Training Officer," Lewis was customarily referred to as "Chief Training Officer."  *See*, discussion, *infra*.

Terry Lewis unsuccessfully applied for the fire chief position.  Firmly believing that the city's hiring decision was unlawfully motivated by race, he initiated a discrimination charge with the Equal Employment Opportunity Commission ("EEOC") in April 2005.  (*See*, Charge of Discrimination; Def. Exh. 14).[3]  Lewis further contends that the city, via Chief Tornabene, unlawfully retaliated against him in various ways after he filed his charge with the EEOC.[4]  On October 4 and 19, 2006, respectively, the EEOC issued Lewis right to sue notices for his retaliation and failure to hire claims.[5]

On January 18, 2007, Lewis filed the instant suit against the City of Ruston and Mayor Dan Hollingsworth.  The complaint seeks relief against defendants for their alleged discriminatory conduct under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*.[6]  On December 14, 2007, defendants filed the instant motion for summary judgment seeking dismissal of plaintiff's claims in their entirety. [doc. # 23].  Plaintiff filed his opposition to the motion for summary judgment on January 3, 2008. [doc. # 33].  The parties filed cross-motions to strike each other's exhibits [doc. #s 34 & 40] which the undersigned granted in part and denied in part.  (*See*, April 22, 2008, Memorandum Order).  Following a delay for briefing the timeliness of plaintiff's retaliation claims, the motion for summary judgment is now before the court.  (*See*,

---

[3]  *See*, discussion, *infra*.

[4]  Lewis filed a retaliation charge with the EEOC in February-March 2006.  (*See*, Charge of Discrimination, Def. Exh. [doc. # 58]).

[5]  *See*, Dismissal and Notice of Rights, Exhs. to [doc. # 54]; March 11, 2008, Letter from Mr. Charles Jones to the undersigned, [doc. # 55]; June 2, 2005, Charge of Discrimination; February 28, 2006, Charge of Discrimination, Def. Exh. 49-1 to [doc. # 58].

[6]  The complaint, as amended, does not specifically set forth defendants' alleged retaliatory conduct.  However, defendants did not challenge the sufficiency of the allegations, which conceivably are broad enough to include claims for unlawful retaliation.  Moreover, plaintiff expounded upon his retaliation claims during his deposition, without objection.

March 12, 2008, Order).

## Summary Judgment Principles

Summary judgment is appropriate when the evidence before the court shows that no genuine issue as to any material fact exists and that the moving party is entitled to judgment as a matter of law.  F.R.C.P. Rule 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  An issue is "genuine" under this standard if the non-moving party presents sufficient evidence such that a reasonable jury could return a verdict in his favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party bears the initial burden in summary judgment and must demonstrate through portions of the pleadings, depositions, answers to interrogatories, admissions and/or affidavits that no genuine issue of material fact exists.  *Celotex Corp.*, 477 U.S. at 323.  Once the moving party has successfully demonstrated the absence of a genuine issue of material fact, the burden shifts to the non-moving party to show the opposite.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  In doing so, the non-moving party may not merely rely on the allegations and conclusions contained within the pleadings; rather, the movant "must go beyond the pleadings and designate specific facts in the record showing that there is a genuine issue for trial."  *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996).  Furthermore, these specific facts must be shown through something more than "some metaphysical doubt as to the material facts, by conclusory unsubstantiated allegations, or by a mere scintilla of evidence."  *Little v. Liquid Air. Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

## Law and Analysis

### I.  Claims Against Mayor Hollingsworth

Plaintiff sued the City of Ruston and Mayor Hollingsworth, in his official capacity, under Title VII of the Civil Rights Act of 1964.  (Compl., as amend. ¶¶ II, III, & VI).  The Fifth Circuit has held that a plaintiff cannot sue *both* his employer or a corporation *and* an agent or officer thereof, acting in his official capacity.  *Smith v. Amedisys Inc.*,  298 F.3d 434, 449 (5th Cir. 2002); *Indest v. Freeman Decorating, Inc.*,  164 F.3d 258, 262 (5th Cir.1999).[7]  Otherwise, under *respondeat superior*, an employer or corporation would effectively be subjected to double liability for the same act.  *Indest, supra* (citing *Allen v. Tulane Univ.*, No. CIV.A.92-4070, 1993 WL 459949 (E.D. La. Nov.2, 1993)).[8]  Here, it is redundant to join as defendants, the City of Ruston and Mayor Hollingsworth, in his official capacity.  Accordingly, defendants' motion to dismiss plaintiff's claims against Hollingsworth is well-taken, and dismissal will be recommended.

### II.  Failure to Hire Claim

#### a) History

Following the retirement of Ruston Fire Department Chief Donnie Watson on September 24, 2004, Mayor Hollingsworth asked the Ruston Fire and Police Civil Service Board ("the Board") to advertise and accept applications for the vacancy.  (Affidavit of Dan Hollingsworth;

---

[7]  *See also, Ackel v. National Communications, Inc.*, 339 F.3d 376, 382 n. 1 (5th Cir.2003) ("Individuals are not liable under Title VII in either their individual or official capacities . . .").

[8]  Plaintiff cited *Huckabay v. Moore*, for the proposition that Mayor Hollingsworth wielded sufficient authority to be considered an "employer" under Title VII.  *Huckabay v. Moore*, 142 F.3d 233, 241 (5th Cir. 1998).  That may be so, but although the defendants in *Huckabay* included a county commissioner and the county, the redundancy of the named defendants was not at issue in that case.  *Id.*

Def. Exh. 45).[9]  Accordingly, the Board issued a notice soliciting applications, and assigned a November 1, 2004, deadline.  (Debbie Hightower Aff., Exh. 1; Def. Exh. 44).  On October 29, 2004, Mayor Hollingsworth asked the Board to extend the application deadline because he believed that only four people had applied for the job.  (Def. Exh. 45).  He asked for the extension so that he would have a greater pool of applicants from which to select the next fire chief.  *Id.*  At the time that Hollingsworth requested the extension, he did not know the names or races of those who had already applied for the position.  *Id.*[10]

The Board honored the mayor's request and issued a notice extending the application deadline until December 6, 2004.  (Exh. 2 to Affidavit of Debbie Hightower; Def. Exh. 44).  James Tornabene submitted his application for the fire chief position on December 6, 2004.  (Affidavit of James Tornabene; Def. Exh. 50).  Mayor Hollingsworth was not aware of the applicants' races until after the December 6, 2004, application deadline had passed.  (Def. Exh. 45).  On January 27, 2005, the Board administered examinations to 18 applicants for the fire chief position.  (Def. Exh. 44-4).  James Tornabene received the highest test score, 91.  *Id.*  Plaintiff, Terry Lewis, and two white applicants, Albert "Byron" Johnson and Gregory M. Thompson received examination scores of 90.  *Id.*  Effective February 22, 2005, the Board placed the persons who had passed the examination on the employment list.  *Id.*

After Mayor Hollingsworth received the list of qualified candidates from the Board, he established a panel to assist him in the selection process.  (Hollingsworth Affidavit; Def. Exh. 45).  The all-white panel consisted of Hollingsworth's assistant, George Byrnside; a former, and

---

[9]  The Board is charged with the duty to determine which applicants meet the minimum qualifications and are qualified to sit for the examination.  *See*, La. R.S. 33:2477, *et seq*.

[10]  Plaintiff did not adduce any contradictory evidence.

then acting Fire Chief for the City of Ruston, Harrell Pipes; and then Assistant Fire Chief, Alvin

Norman.  *Id*.  Mayor Hollingsworth asked Pipes and Norman to review the applications to ensure

that the applicants met the minimum qualifications from the fire department's perspective, and to

forward the acceptable candidates to Byrnside.  *Id*.  The panel initially excluded James

Tornabene from the list of applicants to be interviewed because it was uncertain whether he met

the educational and work history criteria.  (Affidavit of George Byrnside; Def. Exh. 47).

When Tornabene did not receive a call to schedule his interview, he contacted the city on

several occasions to see whether there was a problem with his application.  *Id*.  The first time that

Tornabene spoke or communicated with any official in Mayor Hollingsworth's office was in

March 2005, when Tornabene called about the interview schedule.  (Tornabene Aff.; Def. Exh.

50).  At some point, Byrnside spoke with Tornabene and explained to him that the selection

panel had questions about his educational and employment background.  *Id*.  Byrnside then had a

lengthy conversation with Tornabene and they discussed the latter's relevant experience line by

line.  (Byrnside Affidavit; Def. Exh. 47).  After the conversation, Byrnside determined that

Tornabene met the job requirements and that he should be interviewed for the position.  *Id*.[11]

Shortly thereafter, the city contacted Tornabene to schedule an interview.  (Tornabene Affidavit;

Def. Exh. 50).  The initial slate of eight interviews extended from March 16-21, 2005.  (Def.

Exh. 45-1).  The city scheduled Tornabene's interview for March 30, 2005.  *Id*.

Mayor Hollingsworth determined that none of the applicants who were then employed by

the Ruston Fire Department were capable of enacting the significant changes that were needed in

the department.  (Hollingsworth Aff.; Def. Exh. 45).  Based upon Tornabene's "outstanding

_____

[11]  Byrnside also contacted Tornabene's previous employers and received positive
feedback about him and his qualifications.  *Id*.

interview," Hollingsworth decided that Tornabene was the best suited candidate for the fire chief

position.  *Id.*  George Byrnside thought that Tornabene's interview went "exceptionally well."

(Byrnside Aff; Def. Exh. 47).  The selection panel unanimously recommended James Tornabene

as the best candidate for the fire chief position.  (Hollingsworth Aff.; Def. Exh. 45).

Hollingsworth selected Tornabene as fire chief on the basis of his "very good interview, his

strong background in training, his innovative thinking on fire related issues, and on the

recommendations of Mr. Pipes, Mr. Norman, and Mr. Byrnside."  *Id.*

On April 12, 2005, the Ruston Board of Aldermen considered Mayor Hollingsworth's

appointment of James Tornabene.  *Id.*  The vote resulted in a two to two tie, with one abstention.

*Id.*  Hollingsworth mistakenly believed that he was obligated to break the tie, and he voted to

confirm his appointment of James Tornabene.  *Id.*[12]

On May 13, 2005, Bill Smith and other concerned citizens asked the Board for a public

hearing and/or investigation into discrepancies surrounding Tornabene's application and

qualifications.  *See*, *Smith v. Ruston Fire and Police Civil Service Bd.*, 939 So.2d 586 (La. App.

2d Cir. 2006).  After approximately three public sessions, the Board voted not to further

investigate the matter.  *Id.*  Accordingly, Bill Smith, W. D. Walker, and Terry Lewis petitioned

the 3rd Judicial District Court for the Parish of Lincoln, State of Louisiana for a writ of

mandamus ordering the Board to "1) reject the application of Tornabene for the position of Fire

Chief for the City of Ruston; 2) remove Tornabene from his position based upon his alleged

failure to meet the requirements for the position of Fire Chief; and 3) conduct an investigation

into the process involved in the selection of Tornabene."  *Id.*  The court dismissed the petition.

---

[12]  Unbeknownst to the mayor, his recommendation for a department head prevailed
without further action by him when the board's confirmation vote resulted in a tie.  La. R.S.
33:404.

*Id*.  The appellate court affirmed the decision on appeal, and found that Tornabene was "eminently qualified" for the fire chief position.  *Id*.

**b) Discussion**

"Title VII prohibits an employer from failing or refusing to hire an individual 'because of such individual's race, color, religion, sex, or national origin.'"  *Sharkey v. Dixie Elec. Membership Corp.*,  2008 WL 190043, 3 (Jan. 23, 2008) (unpubl.) (quoting 42 U.S.C. § 2000e-2(a)(1)).[13]  A plaintiff may establish intentional discrimination via direct or circumstantial evidence.  *Wallace v. Methodist Hosp. System*, 271 F.3d 212, 219 (5th Cir. 2001).  "'Direct evidence is evidence which, if believed, proves the fact [of intentional discrimination] without inference or presumption.'"  *Portis v. First Nat. Bank of New Albany, Miss.*, 34 F.3d 325, 328-329 (5th Cir. 1994) (quoting *Brown v. East Miss. Elec. Power Ass'n*, 989 F.2d 858, 861 (5th Cir.1993)).

In the absence of direct evidence, plaintiff may still prove his case via circumstantial evidence pursuant to the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817 (1973).  *Alvarado v. Texas Rangers*,  492 F.3d 605, 611 (5th Cir. 2007) (citation omitted).  The framework requires plaintiff to first create a presumption of intentional discrimination by establishing a prima facie case. *Id*.  To establish a prima facie case for failure to hire or promote, plaintiff must demonstrate that 1) he was a member of a protected class; 2) he applied for the position and was qualified for it; 3) he was not hired despite his qualifications; and 4) someone outside of the protected class was hired instead.  *Thomas v. Trico Products, Corp.*, 2007 WL 3151800 (5th Cir. Oct. 26, 2007) (unpubl.) (citation omitted).

_____

[13]  Courts may not prohibit or restrict the citation of "unpublished" federal judicial opinions which were issued on, or after January 1, 2007.  Fed.R.App.P. 32.1, 47.5.4.

In the case *sub judice*, the city assumes for purposes of the motion for summary judgment that Lewis meets his prima facie burden.  Thus, under the *McDonnell Douglas* framework, defendant must articulate a legitimate, nondiscriminatory reason for its actions.  *Alvarado*, *supra* (citations omitted).  The burden on the employer at this stage is production, not persuasion.  *Id*. If the employer satisfies its burden, then plaintiff's prima facie case dissolves, and he must then establish either:  (1) that defendant's proffered explanation is false or "unworthy of credence," i.e., a pretext for discrimination;[14] or (2) that the employer's reason, while true, is not the only reason for its conduct, and another "motivating factor" is the plaintiff's protected characteristic. *Burrell v. Dr. Pepper/Seven Up Bottling Group, Inc.*, 482 F.3d 408, 412 (5th Cir. 2007); *Alvarado, supra* (citing *Rachid v. Jack In The Box, Inc.*, 376 F.3d 305 (5th Cir. 2004)).

The primary force behind the city's decision to appoint James Tornabene was Mayor Hollingsworth. The city relies upon the mayor's explanation and thought processes to establish the city's legitimate, nondiscriminatory reason for selecting Tornabene.[15]  According to Hollingsworth, he determined that Tornabene was the "best suited applicant" for the position due to his outstanding interview, including his numerous ideas for improvement.  (Hollingsworth Aff., Def. Exh. 45; *See also*, Def. Memo. pgs. 14-15 [doc. # 23]).[16]  The city has articulated a

_____

[14]  In the context of a failure to promote or hire claim, plaintiff can also establish pretext by showing that he was "clearly better qualified" than the person hired.  *See, Burrell, supra*.

[15]  Ordinarily, the person with authority over the employment decision is the one who executes the action against the employee.  *Sharkey v. Dixie Elec. Membership Corp.*,  2008 WL 190043 (5th Cir. Jan. 23, 2008) (citing *Russell v. McKinney Hosp. Venture*,  235 F.3d 219, 226 (5th Cir. 2000)).

[16]  The mayor expounded upon his reasoning in his affidavit.  He believed that the morale of the Ruston Fire Department had been low for years, and that there was a need for more intensive training and strong leadership.  (Hollingsworth Aff.; Def. Exh. 45).  Hollingsworth's primary goal in selecting a new fire chief was to find someone who could think "out-of-the-box," and who had excellent communication and leadership skills.  *Id*. "Tornabene was the most

clear and reasonably specific basis for its hiring decision.  *See*, *Alvarado v. Texas Rangers*, 492 F.3d 605, 616-617 (5th Cir. 2007).  Typically, an employer's subjective assessment of the candidates' performance during the interview process provides a legitimate, nondiscriminatory reason for the hiring decision.  *Id*.  However, an employer does not satisfy its burden of production when it offers evidence of an "otherwise legitimate, nondiscriminatory reason which unmistakably demonstrates that it *could not have motivated*" the employer's challenged decision. *Patrick v. Ridge*,  394 F.3d 311, 318-320 (5th Cir. 2004) (emphasis in original).  In other words, defendant's burden is not met when its proffered rationale is premised upon an "indisputable impossibility."  *Id*.[17]

_____

impressive applicant during the interview process."  *Id*.  Hollingsworth felt that Tornabene stood out from the other candidates due to his personality, contemplative questions, and innovative ideas.  *Id*.  During his interview, Tornabene asked good questions regarding, "1) budget and financial issues, 2) federal and state grants, 3) training, 4) economic development, 5) long range plans for department, 6) growth plan for the City and its impact on the department, 7) city ordinances that affect the department, and 8) policies affecting fire fighters quality of life."  *Id*. During the interview, Tornabene laid out his vision for the Ruston Fire Department and demonstrated "outstanding communication skills."  *Id*.  Tornabene discussed ideas to make the department more efficient, including incorporating rural volunteer units into the fire department, increasing training, and offering free lodging to university students in exchange for their assistance as volunteer fire fighters.  *Id*.

Perhaps unsurprisingly, the mayor's assistant, George Byrnside, echoed the mayor's impressions.  (Byrnside Aff.; Def. Exh. 47). Byrnside opined that during his interview, Tornabene was articulate, confident, and decisive when answering questions.  *Id*.  In contrast, Lewis asked only a few questions, and did not present any extensive ideas or plans for improving the department.  *Id*.  Lewis was never Byrnside's top choice for the fire chief position at any time during the application process.  *Id*.  Byrnside recommended Tornabene for the fire chief position. *Id*.

There is no direct evidence setting forth the thought processes of Pipes and Norman – the two other members of the mayor's selection panel.  Pipes is unable to testify due to ill health. (Affidavit of Betty Pipes; Def. Exh. 46).  Norman has since retired from the department.  *See*, Pl. Opp. Memo., pg. 31.

[17] In *Patrick*, the employer's proffered reason for not hiring plaintiff was its conclusion that the person that they ultimately hired was the best qualified candidate for the position. *Patrick, supra*.  The problem, however, was that the employer had rejected plaintiff for the

10

Plaintiff contends that the focus of the inquiry should be when the city decided not to hire him.  He argues that the circumstances and timing of Tornabene's interview renders defendant's proffered rationale for not selecting him an impossibility.  Plaintiff adduced evidence that at the end of his interview, the applicants were told that the interviewing process was concluded, and that no one else would be interviewed at that time.  (Jerry Lewis Depo., pg. 66; Pl. Exh.).[18] Moreover, Hollingsworth stated in his affidavit that he did not believe that any of the applicants who were then employees of the Ruston Fire Department were capable of making the significant changes needed at the department.  (Hollingsworth Aff.; Def. Exh. 45).

The question arises, when did Hollingsworth make this determination?  He could have formed his opinion immediately following plaintiff's interview.  If so, when coupled with the evidence that Tornabene had not yet been qualified as a viable candidate, the mayor plausibly decided not to hire plaintiff before the city even scheduled Tornabene's interview.  Under these circumstances, the mayor's explanation that he did not select Lewis for the position because of Tornabene's superior communications skills and ideas would be impossible, and thus not a legitimate non-discriminatory reason at all.  *See, Patrick, supra*.

Nonetheless, *Patrick* is materially distinguishable from the present circumstances because in *Patrick*, the employer admitted that it had rejected plaintiff before seeking out additional applicants.  *Patrick, supra*.  Here, there is only circumstantial evidence that the mayor rejected Lewis before scheduling Tornabene's interview.  Therefore, the city's proffered rationale is not an "indisputable impossibility."  Accordingly, the city has met its burden of production under the

---

promotion before the eventual hiree ever became a candidate.  *Id*.

[18]  Plaintiff's interview was scheduled last on the original slate of interviews.  (Def. Exh. 45-2).

*McDonnell Douglas* framework.

At this point, the onus shifts to plaintiff to demonstrate that defendant's proffered rationale was pretext for discrimination or that defendant was also motivated by discriminatory animus.  Plaintiff's circumstantial evidence that the mayor rejected plaintiff immediately following his interview may be used to demonstrate that the city's proffered rationale was false, and that it was instead a mere pretext for discrimination.

The undersigned observes that even if the mayor did reject plaintiff immediately after his interview, he conceivably had a legitimate, non-discriminatory reason for doing so – his belief that existing department members were incapable of making required changes.[19]  However, plaintiff adduced evidence that on the afternoon following his interview, (or the next day), he was told by a member of the selection panel, Harrell Pipes, that the pool of fire chief candidates had been narrowed down to plaintiff and a white male, Byron Johnson.  (Pl. Affidavit, Pl. Exh. A; Pl. Depo., pg. 82-83).[20]  This evidence seemingly contradicts plaintiff's argument that the mayor rejected him after his interview.  However, plaintiff argues that it was only after Johnson withdrew his name from consideration that the city identified Tornabene as a potential candidate.[21]  In other words, it is the plaintiff's position that the mayor rejected plaintiff's

---

[19]  Mayor Hollingsworth stated that he was not impressed with Terry Lewis during his interview.  *Id*.  Lewis asked only a few questions.  *Id*.  Hollingsworth did not recall Lewis presenting any extensive ideas or plans for improving the department.  *Id*.  Hollingsworth's lasting memory from Lewis's interview was his comment, "give me the ball coach, I'm ready to play."  *Id*.

[20]  Johnson was employed by the Alexandria Fire Department at the time.  (Pl. Depo., pg. 84; Pl. Exh.).

[21]  There is no evidence establishing the date that Johnson withdrew his name from consideration or when in March 2005 that Byrnside talked with Tornabene about his qualifications.  Plaintiff attempted to rely on a statement by a fellow fire department employee, Ricky Phillips.  (Pl. Exh. C).  However, the undersigned granted defendants' motion to strike this

candidacy and sought to rehabilitate another white candidate previously deemed unqualified as soon as the leading white candidate withdrew.  The fact that Johnson withdrew his name some time after the original slate of interviews concluded and at approximately the same time that Tornabene's application was rehabilitated suggests a correlation.

Of course, even if the mayor's assistant did not reconsider Tornabene's application until Johnson withdrew, this may be explained by the facially non-discriminatory reason that the mayor simply wanted to hire someone from outside the department.  Indeed, there is evidence that the mayor believed that the morale of the Ruston Fire Department had been low for years, and that there was a need for more intensive training and strong leadership.  (Hollingsworth Aff.; Def. Exh. 45).[22]  However, that was not the reason principally advocated by the city in its motion for summary judgment.  It maintains that the decision not to hire Lewis was not made until Tornabene was selected.  This explanation suggests that Lewis was still in the running for the position at the time of Tornabene's interview.  Perhaps technically he was – especially if Tornabene's interview had turned out to be unsatisfactory, but, there is evidence that the mayor was not inclined to hire Lewis even before Tornabene's interview.  Whether the mayor's disposition was legitimately premised upon his desire to hire someone untainted by the perceived problems of the department, or unlawfully motivated by plaintiff's race, is a question for the trier of fact, where, as here, the proffered rationale is contradicted by the record.  *See, Burrell v. Dr.*

_____

statement.  (Memorandum Order).  Plaintiff also cited his own affidavit to support the timing. (Pl. Exh. A).  Yet, no such statement appears in his affidavit.

[22]  Plaintiff questions the mayor's belief that the fire department suffered from a morale problem.  He contends that on anonymous surveys, several fire department employees indicated that the mayor was the department's biggest problem.  (Pl. Exh. D).  The questionnaires document various concerns by department personnel including pay, training, internal divisions, and employee retention.  (Pl. Exh. D).

13

*Pepper/Seven Up Bottling Group, Inc.*, 482 F.3d 408, 415 (5th Cir. 2007) (unexplained

inconsistencies between various proffered rationales demonstrate pretext) (citing *Gee v. Principi*,

289 F.3d 342, 347-48 (5th Cir. 2002)).

Plaintiff's argument that the mayor's decision not to hire him was a pretext for unlawful

race discrimination is buttressed by at least one discriminatory remark attributable to the mayor.

Ordinarily, any statement or document showing a discriminatory motive on its face constitutes

direct evidence of discrimination. *Portis, supra* (citations omitted); *see also, Jones v. Robinson*

*Property Group, L.P.*, 427 F.3d 987, 993 (5th Cir. 2005) ("statements or documents which show

on its face that an improper criterion served as a basis-not necessarily the sole basis, but a

basis-for the adverse employment action are direct evidence of discrimination."). When a person

with decision making authority evinces racial animus, that fact may constitute direct evidence of

discrimination. *Jones*, 427 F.3d at 993 (citations omitted). Discriminatory comments can

demonstrate pretext when there is other evidence of pretext. *See*, *Auguster v. Vermilion Parish*

*School Bd.*, 249 F.3d 400 (5th Cir. 2001).[23] Nonetheless, "'for comments in the workplace to

provide sufficient evidence of discrimination, they must be 1) related [to the protected class of

persons of which the plaintiff is a member]; 2) proximate in time to the [challenged action]; 3)

made by an individual with authority over the employment decision at issue; and 4) related to the

employment decision at issue.'" *Id*. (quoting *Krystek v. Univ. of S. Miss.*, 164 F.3d 251, 256 (5th

Cir.1999)).[24] Applying this test, most of the alleged discriminatory comments identified by

---

[23] Remarks are probative of discriminatory intent when they do not constitute the only evidence of pretext. *See, Palasota v. Haggar Clothing Co.*, 342 F.3d 569, 577 (5th Cir. 2003) (citation omitted).

[24] The Fifth Circuit's stray remarks jurisprudence remains in effect at least in situations where plaintiff has not produced substantial evidence of pretext. *Id*. (citation omitted). To this point, the undersigned would not characterize plaintiff's evidence of pretext as "substantial."

plaintiff prove unavailing.

Plaintiff first alleges that the two fire department members on the selection panel, Pipes and Norman, had previously uttered racial slurs.[25]  According to Jerry Lewis, Alvin Norman stated "we're going to call them n----, but you and Terry, you're good guys, so you guys are not n-----, those are the n----, and you guys are the black guys."  (Jerry Lewis Depo., pg. 34; Pl. Exh.).[26]  However, Lewis could not say when this occurred.  *Id*.  Moreover, the comments are not related to the employment decision at issue.  Jerry Lewis also stated that in the late 70's or early 80's, Harrell Pipes said that "the only reason we hired you n---- up here is because they made us." (Jerry Lewis Depo., pg. 37; Pl. Exh.). Again, the comment was not proximate in time to the challenged employment action or related to Lewis's non-selection as fire chief.

Plaintiff next contends that several alleged statements by Mayor Hollingsworth demonstrate his bias.  He emphasizes that during Mayor Hollingsworth's deposition, he characterized his three former radio stations as "country," "black," and "classic rock." (Hollingsworth Depo., pg. 7; Pl. Exh.).[27]  Upon further questioning, the mayor clarified that by "black," he meant that the station was directed at the minority community, and that it played gospel music and rhythm and blues.  *Id*.  Plaintiff faults the mayor for initially classifying two

---

[25] "If the employee can demonstrate that others had influence or leverage over the official decisionmaker, and thus were not ordinary coworkers, it is proper to impute their discriminatory attitudes to the formal decisionmaker."  *Sharkey v. Dixie Elec. Membership Corp.*,  2008 WL 190043 (5th Cir. Jan. 23, 2008) (quoting *Russell v. McKinney Hosp. Venture*,  235 F.3d 219, 226 (5th Cir. 2000)).  Here, there is evidence that Pipes and Norman influenced the mayor's hiring decision because the mayor said that he relied on their recommendations.  (Hollingsworth Aff.; Def. Exh. 45).

[26] Throughout this report and recommendation, some citations to exhibits remain unnumbered or unlettered because that is how they were submitted to the court.

[27] Prior to becoming mayor, Hollingsworth owned and managed three radio stations in Ruston, Louisiana.  (Hollingsworth Depo., pg. 7; Pl. Exh.).

stations by music genre, and then referring to the other station by the community that it served. Plaintiff did not elaborate upon the significance of this discrepancy, but presumably he contends that it tends to demonstrate the mayor's purported bias against blacks. Yet, there is no evidence that this comment is related to the employment decision at issue.

The record also contains evidence that Bill Smith heard Mayor Hollingsworth state that when he was in Mississippi, all he "knew was n----." (Dep. of Bill Smith, pg. 21; Def. Exh.). However, Mayor Hollingsworth later learned that it was improper to use that word. *Id*. Again, there is no evidence that this remark was temporally or otherwise related to the employment decision at issue.[28]

Plaintiff also faults the mayor for his personal opposition to affirmative action. (Hollingsworth Affidavit; Def. Exh. 45). Yet, Hollingsworth explained that he viewed affirmative action as a racial preference, rather than racial equality as required by the law. *Id*. He further affirmed that he strongly supported equal opportunity in employment. *Id*. Plaintiff did not adduce any authority to support his argument that opposition to the concept of affirmative action evinces racial animus. In any event, there is no evidence that the statement was temporally related to the employment decision.[29]

Finally, the record contains evidence that Mayor Hollingsworth purportedly asked Bill

_____

[28] Plaintiff further relies on former RFD member, Harvey Davis's affidavit wherein he recounted that Mayor Hollingsworth had stated that he was not going to hire a black person or allow his town to be turned into another Richwood. (Pl. Exh. B). However, this evidence has been stricken. (*See*, April 22, 2008, Memorandum Order). The undersigned also struck RFD member, Ricky Phillips' allegation that Mayor Hollingsworth "let it be known that he was determined not to appoint another Black person as fire chief." (Pl. Exh. C; *see*, April 22, 2008, Memorandum Order).

[29] Hollingsworth executed his affidavit over two years after the employment decision. *See, Auguster, supra* (comment made almost one year before the challenged employment decision is too remote).

Smith whether "your people would overlook all of the strides we've made in city government since I've been Mayor to hire one of your kind to be fire chief."  (Dep. of Bill Smith, pg. 24; Def. Exh.).  After Smith questioned Mayor Hollingsworth by what he meant by "your people" and "your kind," the Mayor explained that he meant "black people."  *Id*.  There is no question that the statement addresses the protected class at issue, appears to be temporally and directly related to the challenged action, and was uttered by the primary decision-maker.  Moreover, references to "you people" or "your people" when referring to a protected class demonstrate discriminatory animus and are presumptively offensive.  *See, Alexis v. McDonald's Restaurants of Massachusetts, Inc.*,  67 F.3d 341, 348 (1st Cir. 1995); *Estate of Daramola v. Coastal Mart, Inc.*, 170 Fed. Appx. 536, 547-548, 2006 WL 497549 (10th Cir. 2006) (unpubl.).  This discriminatory remark together with the evidence casting doubt upon the city's reason(s) for not selecting plaintiff for the fire chief position, combine to satisfy plaintiff's summary judgment burden of demonstrating that the city's proffered rationale was a pretext for unlawful discrimination.

Having found that the city is not entitled to summary judgment on plaintiff's failure to hire claim, the court need not address plaintiff's additional arguments on this issue.  Nonetheless, the undersigned shall briefly do so.

Plaintiff argues that he was clearly more qualified than Tornabene for the fire chief position. A plaintiff may survive summary judgment and take his case to trial by providing evidence that he was "clearly better qualified" than the employee selected for the position at issue.  *Celestine v. Petroleos de Venezuella SA*,  266 F.3d 343, 356 -357 (5th Cir. 2001) (citations omitted).  Thus, evidence of the plaintiff's superior qualifications is probative of pretext.  *Id*.  However, to be probative, the differences in qualifications must be "of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen

17

the candidate selected over the plaintiff for the job in question." *Id*.  As the cases recognize, the bar is set quite high.  *Id*.

Plaintiff commences his battle of resumes by arguing that Tornabene did not meet the minimum requirements for the fire chief position.  However, the undersigned observes that at least one Louisiana state court has already found that Tornabene was eminently qualified for the fire chief position.  *Smith v. Ruston Fire and Police Civil Service Bd.*, 939 So.2d 586, 588 (La. App. 2d Cir. 2006).  "'[O]nce a court has decided an issue of fact or law necessary to its judgment, that decision is conclusive in a subsequent suit based on a different cause of action involving a party to the prior litigation.'"  *Koch v. City of Hutchinson*, 814 F.2d 1489, 1494 (10th Cir. 1987) (quoting, *United States v. Mendoza*, 464 U.S. 154, 158, 104 S.Ct. 568, 571 (1984)).[30]

In any event, plaintiff's challenge to Tornabene's minimum qualifications is groundless. Plaintiff argues that Tornabene did not have his degree in Fire Service Management by the time of the civil service examination on January 27, 2005.[31]  However, Tornabene's application and resume state that he was scheduled to graduate in December 2004 with an associate's degree in Fire Service Leadership [sic].  (Exh. to Deposition of Terry Lewis; Def. Exh. 1).  In a June 16, 2005, letter to Mayor Hollingsworth, the Registrar for Southern Arkansas University Tech confirmed that Tornabene graduated on December 14, 2004, with an Associate of Science degree in Fire Service *Management*.  (Pl. Exh. G) (emphasis added).[32]

---

[30]  Lewis was also a plaintiff in the *Smith* case.

[31]  The Notice of Competitive Fire Chief Examination clearly states that "[u]nless otherwise specified, all requirements must be met before admission to examination."  (Def. Exhs. 44-1 & 44-2).

[32]  Plaintiff adduced excerpts from the Southern Arkansas University Tech catalog stating that the graduation ceremony was held only once per year in May.  (Pl. Exh. H).  However, the undersigned granted defendants' motion to strike the exhibit.  (*See*, April 22, 2008,

Plaintiff next challenges the civil service requirement that Tornabene have at least eight years of progressively responsible experience in fire service positions.  However, Tornabene's resume and application demonstrate that Tornabene had more than eight years of fire service and training experience.  (Exh. to Deposition of Terry Lewis; Def. Exh. 1).[33]

Plaintiff next questions the applicability of Tornabene's numerous training certifications in Louisiana.  Plaintiff emphasizes that the State of Louisiana does not recognize other states' certificates or certifications unless they are approved by the International Fire Service Accreditation Congress.  (Ricky Phillips Aff.; Pl. Exh. C).[34]  However, there is no evidence that Tornabene's certificates and certifications were not approved by the International Fire Service Accreditation Congress.

Plaintiff protests that the highest rank previously obtained by Tornabene was fire truck driver, whereas, he was "Chief Training Officer" which placed him beneath the fire chief on the flow chart.  Pl. Exh. L.[35]  While plaintiff is correct that he held a higher rank than Tornabene, that

---

Memorandum Order).

Plaintiff also questions why Mayor Hollingsworth waited until June 16, 2005, – two months after Tornabene's appointment to obtain a letter confirming Tornabene's degree in Fire Service Management.  Yet, there is no evidence that the city was obligated to confirm his degree requirements in advance, or that it did not do so by calling the university.  The mayor likely obtained the letter at that time due to ongoing challenges to Tornabene's qualifications before the Civil Service Board.

[33]  Plaintiff further relies on a newspaper article to support his argument regarding Tornabene's purported lack of qualifications.  (Pl. Exh. I).  However, the undersigned sustained defendants' motion to strike the article as hearsay.  (*See*, April 22, 2008, Memorandum Order).

[34]  Louisiana also often requires reciprocity before it will recognize certifications from other states.  (*See*, Jerry Lewis Depo., pgs. 110-111).  But, there is no evidence that Louisiana did not have reciprocity agreements with these other states.

[35]  Plaintiff served as a captain, and "Substitute Fire Chief."  Pl. Exh. J.
In his memorandum, plaintiff contends that he served as a captain from 1978 until 1994.

does not establish that Tornabene was not also exposed to supervisory roles or leadership opportunities.  *See*, Exh. to Deposition of Terry Lewis; Def. Exh. 1.

Plaintiff emphasizes the considerable number of training classes that he took, his bachelor of arts degree in pre-law/political science, his numerous certifications, and his membership in various organizations.  (Pl. Exh. J).  On the other hand, Tornabene's training and teaching experience is impressive in its own right.  Since 2002, Tornabene has provided training to 135 fire departments in a nine county area; he obtained an associate degree in Fire Service Management; and he too has numerous certifications.  (Exh. to Deposition of Terry Lewis; Def. Exh. 1).

According to their respective resumes, plaintiff has approximately 12 more years of fire department experience than Tornabene.[36]  However, an "attempt to equate years served with superior qualifications ... [is] unpersuasive." *Nichols v. Loral Vought Systems Corp.*,  81 F.3d 38, 42 (5th Cir. 1996) (citation omitted).  Greater work experience alone does not raise a fact issue as to whether one applicant is clearly more qualified than another.  *Id*.  "More evidence, such as comparative work performance, is needed."  *Id*.

There is also evidence that in February 2004 at least 23 City of Ruston firefighters were displeased enough to sign a letter addressed to then-Chief Watson regarding plaintiff's practice of assigning each member of his training class a chapter to teach.  (Def. Exh. 26).[37]  They stated

_____

(Pl. Memo., pg. 15).  However, his resume indicates that during those years, he served as a firefighter, fire driver, and captain.  (Pl. Exh. J).  Given plaintiff's lack of firefighting experience before joining the RFD, it is unlikely that the department hired him in 1978 as a captain.

[36]  Even if plaintiff participated in more instructional courses and programs than Tornabene, that is to be expected given plaintiff's greater length of service in the firefighting field.  *See, Odom v. Frank*, 3 F.3d 839, 846 (5th Cir. 1993).

[37]  The firefighters sent a copy of the letter to Mayor Hollingsworth.  *Id*.

20

that they were not certified instructors, and did not feel equipped or prepared to teach class hours for employee certification.  *Id*.[38]  The record is devoid of any similar question mark regarding Tornabene's teaching practices.

In the end, the resume disparities between Lewis and Tornabene are not so favorably tilted toward plaintiff such that "no reasonable person, in the exercise of impartial judgment, could have chosen [Tornabene] over the plaintiff for the job in question."  *Deines v. Texas Dept. of Protective and Regulatory Service*, 164 F.3d 277, 280-281 (5th Cir. 1999); *see also, Manning v. Chevron Chemical Co., LLC*, 332 F.3d 874 (5th Cir. 2003) (plaintiff unsuccessfully attempted to demonstrate that he was clearly better qualified by pointing to his educational background, his various technical and analytical skills, and his asserted good performance during the interview process); *Eberle v. Gonzales*, 240 Fed. Appx. 622 (5th Cir. 2007) (unpubl.) (pretext not established where plaintiff argued that he was clearly better qualified than hiree because he had taken over 100 classes, had won numerous awards, had served as an instructor, was bilingual, and had worked at the agency longer than the hiree).  Indeed, here, plaintiff has not controverted defendant's evidence that Tornabene was the most impressive candidate during the interview process, and specifically, that Tornabene asked the most contemplative questions and offered the most innovative ideas for the RFD.  (Hollingsworth and Byrnside Affs.; Def. Exhs. 45 & 47).[39]

---

[38]  Terry Lewis felt that the firefighters were rejecting their certification requirements, not his instruction methods.  (Lewis Depo., pgs. 248-250, 312-315, Pl. Exh).  However, the firefighters stated in their letter that they had "no problem" furthering their education, as long as it was accomplished through proper instruction.  (Def. Exh. 26).

[39]  *See also*, Tornabene's Interview Questions, Exh. 1 to Tornabene Depo.; Def. Exh. 50.  Plaintiff adduced evidence that Tornabene's reforms have not been implemented since his appointment.  (Affidavit of Harvey Davis; Pl. Exh. B).  However, that evidence was stricken. (April 22, 2008, Memorandum Order).  Moreover, that Tornabene's plans ultimately proved unsuccessful does not undermine his proposals as a legitimate basis for his hiring.  There is no evidence that the hiring committee knew, or should have known that Tornabene's plans would

"Where the plaintiff has offered no evidence to rebut the employer's facially benign explanations, no inference of discrimination can be drawn." *Scott v. University of Mississippi*, 148 F.3d 493, 507 (5th Cir. 1998) (citations omitted).  Plaintiff has not demonstrated that he was clearly better qualified than Tornabene, and thus, has failed to demonstrate pretext on this basis. *Manning, supra*.[40]

Plaintiff raises several other arguments.  He argues that the City of Ruston has no black department heads in any of its 17 departments.  However, plaintiff has not adduced any evidence of "gross statistical disparity" between the racial makeup of the department heads and the "qualified pool" of applicants. *Brauninger v. Motes*,  2007 WL 4467583 (5th Cir. Dec. 20, 2007) (unpubl.).  Moreover, statistical evidence supports the plaintiff's prima facie case, but does not demonstrate pretext. *Manning, supra* (citation omitted).[41]

Plaintiff contends that the mayor exhibited his "adamancy to appoint Tornabene" when he cast a tie-breaking vote before the board of aldermen to appoint Tornabene.  As it turns out, a tie-breaking vote was superfluous under Louisiana law, because in the case of a tie vote, the mayor's recommendation prevails without further action by the mayor.  La. R.S. 33:404.  Plaintiff contends that "the overt acts of the Mayor are evidence of his desire to show prejudice against Mr. Lewis."  (Pl. Memo., pg. 24).  The mayor's vote is an unremarkable affirmation of his

_____

not be implemented or were otherwise infeasible.

[40]  Nonetheless, Tornabene and Lewis's respective qualifications may be relevant at trial. Not only may plaintiff attempt to shore up the deficiencies in his argument, but the city may argue that it would have made the same hiring decisions regardless of any discriminatory animus.

[41]  To the extent that plaintiff attempts to circumvent his *McDonnell Douglas* burden of proof by arguing that the city has a pattern and practice of discrimination, this alternative approach appears foreclosed by Fifth Circuit precedent. *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 356 (5th Cir. 2001) (citations omitted).

support for his chosen candidate.  The mayor's continued support for Tornabene only demonstrates discriminatory animus, if discriminatory animus motivated the mayor's decision-making in the first place.

Plaintiff seems to argue that the mayor demonstrated discriminatory bias by failing to appoint plaintiff in accordance with the provisions of the Lawrason Act, Louisiana Revised Statute 33:386(A).  The Lawrason Act provides that in the event of certain vacancies in municipal offices, the mayor and board of aldermen shall give a preference to residents of the municipality "if all other considerations are equal."  La. R.S. 33:386(A).  Plaintiff has not demonstrated that all other considerations were equal.  Moreover, there is no evidence that the mayor was even aware of the provisions of the Lawrason Act.

## III.  <u>Retaliation</u>

### a) <u>Timeliness</u>

Plaintiff contends that he suffered numerous acts of retaliation as a result of filing his original discrimination charge with the EEOC.  They include

> 1) Issuance of a letter of deficiency; 2) Change in official job title; 3) Unwarranted change of his lunch schedule; 4) The posting of a seniority list which contained the suspension history of Plaintiff and other employees; 5) Unwarranted assignment to the alarm room; 6) An unwarranted request to submit to a drug test two (2) days after an alleged incident; 7) An unfair investigation into damaged property; 9) [sic] A [sic] unwarranted request to gather documents to prepare for the City's insurance rating; 10) Calling for a civil service exam for the position currently occupied by Plaintiff Terry Lewis; 11) A statement made by Mayor Hollingsworth to the Board of Alderman [sic] in a letter which showed the Mayor's desire to terminate Mr. Lewis for no true cause; and 12) Denial of IFSAC re-certification.

(Pl. Opp. to MSJ, pgs. 3-4).[42]

Plaintiff ostensibly raised these retaliation claims in eight "charges" filed with the EEOC.

In its motion for summary judgment, the city noted that plaintiff adduced charges of retaliation which had not been produced by the EEOC in response to the city's Freedom of Information Act request. (Def. Memo., pg. 5, n3).[43] Moreover, in its answer to plaintiff's amended complaint, the city maintained that plaintiff's complaint was untimely and that he failed to exhaust his administrative remedies. [doc. # 22]. Accordingly, in a March 5, 2008, telephone conference with counsel, the undersigned queried whether the EEOC had issued right to sue notice(s) regarding plaintiff's unlawful retaliation claims. (March 5, 2008, Electronic Minutes). In response to the undersigned's concerns, plaintiff's counsel provided the court with copies of three right to sue notices issued by the EEOC. One notice dated December 1, 2006, addressed EEOC Charge No. 461-2007-00201; a second notice dated October 19, 2006, referenced Charge No. 270-2005-03445; and a third undated notice referred to Charge No. 270-2005-05246.

In subsequent correspondence with the court, plaintiff's counsel represented that following a conversation with the EEOC's New Orleans Field Office, he learned that the agency mailed the right to sue notice addressing Charge Number 270-2005-05246 on October 4, 2006. (March 11, 2006, Letter from Mr. Charles Jones to the undersigned [doc. # 55]). Plaintiff is presumed to have received the October 4, 2006, right to sue letter no later than October 11, 2006,

---

[42] In his memorandum, plaintiff raised two additional acts of retaliation: his removal from the department's hiring and interview committee, and Chief Tornabene's proposal to combine his position with the public education officer position. (Pl. Memo., pgs. 31-33).

[43] For purposes of the motion, defendants initially assumed that the charges were submitted to the EEOC. *Id*.

or 99 days before he filed the instant suit.[44]  The law is clear that Title VII claimants must file a

civil action within 90 days after receipt of a right to sue notice from the EEOC.  *Taylor v. Books*

*A Million, Inc.*, 296 F.3d 376, 379 (5th Cir. 2002) (citation omitted).  Due to the patent

untimeliness of at least some of plaintiff's retaliation claims, the undersigned ordered plaintiff to

"file a memorandum specifying:  the dates when plaintiff suffered each alleged retaliatory act for

which he seeks relief in this suit; the dates when plaintiff filed charges with the EEOC regarding

each alleged retaliatory act; and the corresponding charge numbers issued by the EEOC for each

alleged retaliatory act."  (*See*, March 12, 2008, Order).  The court directed plaintiff to support the

foregoing with competent summary judgment evidence, and address whether any of his

retaliation claims are time-barred.  *Id*.[45]

In his memorandum, plaintiff presumes that he received the October 4, 2006, right to sue

notice three days later on October 7, 2006.  (Pl. Memo., pg. 4 [doc. # 57]).  He argues, without

any supporting authority, that excluding weekends and holidays, he timely filed suit on January

18, 2007, – 71 days after receipt.  *Id*.  However, the Fifth Circuit does not omit weekends and

holidays from computation of the 90 day period.  *See e.g., Prophet v. Armco Steel, Inc.*,  575 F.2d

579, 580 (5th Cir. 1978).[46]  Also, at least one court has looked to Rule Six of the Federal Rules of

Civil Procedure to find that the 90 day period to file suit *includes* weekends and holidays.  *See,*

*Swain v. New York Life Ins. Co.*, 979 F.2d 856, (9th Cir. Nov. 18, 1992) (unpubl.).  Accordingly,

the alleged acts of retaliation set forth in Charge No. 270-2005-05246 are time-barred.  *Ringgold*

---

[44]  The Fifth Circuit presumes that a right to sue letter is received between three and seven
days after it is mailed.  *Morgan v. Potter*, 489 F.3d 195, 196 (5th Cir. 2007).

[45]  The order further directed defendant to file a response and any appropriate summary
judgment evidence.  *Id*.

[46]  The 90 day limitation period to file a lawsuit is strictly construed.  *Taylor, supra*.

*v. National Maintenance Corp.*, 796 F.2d 769, 770 (5th Cir. 1986) (suit filed 92 days after delivery of right to sue letter was untimely).[47]

The undersigned emphasizes that despite instructions to the contrary, plaintiff did not identify the alleged retaliatory acts associated with Charge Number 461-2007-00201 and the ensuing December 1, 2006, right to sue notice.[48]  Accordingly, the court does not know whether Charge Number 461-2007-00201 addresses retaliation claims or other instances of racial discrimination.  Moreover, since plaintiff did not identify the claims encompassed in the December 1, 2006, right to sue notice for Charge Number 461-2007-00201, there is no evidence that plaintiff ever received a right to sue notice for those retaliation claims which were not included in Charge Number 270-2005-05246.  In fact, plaintiff's brief and arguments suggest that he never perfected a formal EEOC charge for his remaining retaliation claims.

In response to the undersigned's March 12, 2008, Order, plaintiff adduced copies of "charge questionnaires" which he labeled as retaliation charges one through eight.  (Pl. Memo., Exhs.; [doc. # 57]).[49]  Plaintiff testified that he submitted the questionnaires to the EEOC.  (Pl.

_____

[47]  The retaliation claims detailed in Charge Number 270-2005-05246 included a written letter of guidance, the loss of "Chief" from plaintiff's title, a change of lunch schedule, and a requirement to seek permission from Chief Tornabene to perform his duties.  (Pl. Exhs. to Memo. [doc. # 57]).

[48]  Plaintiff also did not provide a copy of the charge.
The court ordered plaintiff *inter alia*, to provide corresponding charge numbers issued by the EEOC for each alleged retaliatory act.  (March 12, 2008, Order).  In its response to the court's March 12, 2008, Order, the city pointed out that plaintiff failed to identify the alleged discriminatory acts associated with Charge Number 461-2007-00201.  (Def. Memo., pg. 5; [doc. # 58]).  Although plaintiff filed a reply, he still did not identify the alleged discriminatory acts associated with Charge Number 461-2007-00201.

[49]  "1st Retaliation," "2nd Retaliation Charge," etc. appear at the top of the respective questionnaires.  Plaintiff admitted that he completed the questionnaires.  (*See*, Pl. Depo. pgs. 151, 163-165, 168, 172-173; Def. Exh.).

Depo., pgs. 164, 293-294, 297; Def. Exh.).  The Fifth Circuit has described an EEOC

questionnaire, also known as EEOC Form 283, as a "preliminary charge form."  *Galvan v. Bexar*

*County*, 785 F.2d 1298, 1301 (5th Cir. 1986).  The EEOC does not routinely treat intake

questionnaires as charges.  *Steffen v. Meridian Life Ins. Co.*,  859 F.2d 534, 542 -543 (7th Cir.

1988).[50]  The agency's general practice is to clarify the allegations and then prepare a formal

charge of discrimination for the complainant to review and to verify.  *Edelman v. Lynchburg*

*College*,  535 U.S. 106, 115, 122 S.Ct. 1145, 1150 n 9 (2002).[51]  Nonetheless, the Fifth Circuit

has indicated a willingness to treat an intake questionnaire as a formal EEOC charge at least

when 1) it complies with the EEOC's requirements for a charge, and 2) the plaintiff believed that

the intake questionnaire sufficed to constitute a charge.  *Gutierrez v. H & C Communications,*

*Inc.*, 1993 WL 210133 (5th Cir. 1993) (unpubl.) (citing *Steffen, supra*).

According to the EEOC, a charge is sufficient when the EEOC *receives* from the charging

party "a written statement sufficiently precise to identify the parties, and to describe generally the

action or practices complained of."  29 C.F.R. § 1601.12.  The charge must also be signed and

verified.  29 C.F.R. § 1601.9.[52]  Here, there is no question that the questionnaires completed by

plaintiff were written statements which identified the parties and the challenged practices.  (Pl.

Memo., Exhs. [doc. # 57]).  Moreover, the questionnaires were signed under penalty of perjury.

*Id*.  The only missing ingredient is any evidence that the EEOC actually received the

---

[50]  At least in 1988, the fine print on the back of the form stated *inter alia* that its purpose
was "to determine ... jurisdiction over potential charges, and to provide pre-charge filing
counseling . . ."  *Id*.

[51]  "The EEOC's standard practice is to caution complainants that if they fail to follow up
on their initial unverified charge, the EEOC will not proceed further with the complaint."

[52]  "The term verified shall mean sworn to or affirmed . . . or supported by *an unsworn*
*declaration in writing under penalty of perjury*."  29 C.F.R. § 1601.3

questionnaires.  The city adduced evidence that the second through eighth retaliation

questionnaires were not produced by the EEOC in response to counsel's Freedom of Information

Act requests.  (Price Barker Affidavit, Def. Exh. 48 [doc. # 58]).  Rather, they were first

produced by plaintiff in response to a subpoena duces tecum.  *Id*.  Further, plaintiff acknowledges

in his memorandum that when he called the EEOC to inquire about his outstanding complaints,

he was told that they could not find any record of his filings.  (Pl. Memo., pg. 6. [doc. # 57]).

Plaintiff's awareness that the EEOC had denied any record of his outstanding EEOC

complaints also bears upon whether he believed that the questionnaires were completed charges.

Certainly, if the EEOC did not receive the questionnaires, they were ineffective.  *See*, 29 C.F.R. §

1601.12.  Moreover, this was not plaintiff's first rodeo.  He had previously filed complaints with

the EEOC which the agency had compiled into formal charges and returned to him for review

and verification.  (*See*, Charge Numbers 270-2005-03445 and 270-2005-05246, Def. Exhs. 49-1

[doc. # 58]).  The EEOC transmitted Charge Number 270-2005-03445 to Lewis via an April 29,

2005, letter.  (Def. Exh. 49-1 [doc. # 58]).  The letter told plaintiff to sign and return the charge,

whereupon a copy of the charge would be sent to the employer within ten days after receipt of the

signed charge.  *Id*.  Lewis's recent experience with the EEOC charge process precludes a

reasonable belief that transmitting questionnaires to the EEOC, even if they were received,

completed his charge.  Accordingly, the questionnaires were not transformed into bonafide

charges.  *See, Gutierrez, supra*.[53]

_____

[53]  In his memorandum, plaintiff mentions that the EEOC's New Orleans field office was
closed for a time in the aftermath of Hurricane Katrina.  He acknowledges, however, that the
EEOC office opened on a limited basis on November 29, 2005, and fully reopened in January
2006.  (Pl. Memo., pgs. 5-6. [doc. # 57]).  Plaintiff states, without supporting authority, that files
were lost or destroyed as a result of the hurricane.  However, plaintiff had 300 days from the date
that the alleged discriminatory acts occurred to file a charge with the EEOC.  *See,  Huckabay v.
Moore*, 142 F.3d 233, 238 (5th Cir. 1998) (citation omitted).  Accordingly, he had until June 7,

The court is left therefore with at least three time-barred retaliation claims and eight or so other retaliation claims that have not been administratively exhausted. *See, Hoffman v. Boeing*, 596 F.2d 683, 685 (5th Cir. 1979) (complaint that fails to allege or excuse exhaustion of administrative remedies is subject to dismissal). Plaintiff does not advocate any further basis to establish that his retaliation claims are properly before the court. Nonetheless, the undersigned is duty-bound to consider any other viable avenues. The only readily apparent alternative is to "piggyback" plaintiff's retaliation claims to his administratively exhausted and timely filed failure to hire claim.[54]

In this vein, there is a line of Fifth Circuit cases which holds that a plaintiff need not exhaust administrative remedies prior to asserting a retaliation claim which grows out of an

---

2006, to file a charge regarding the earliest of his remaining retaliation claims. (*See*, Pl. Memo., pgs. 5-6. [doc. # 57]) (setting forth dates that retaliatory acts occurred). Plaintiff offers no reason why he could not have ensured that his charges were timely filed during that period, especially since he acknowledged calling the EEOC to check on the status of his complaints. In addition, as early as November 1, 2005, plaintiff indicated on one of his questionnaires that he had conferred with his attorney. (Pl. Memo., Exhs. [doc. # 58]). Plaintiff has not demonstrated a basis for equitable tolling. *See generally, Ramirez v. City of San Antonio*, 312 F.3d 178 (5th Cir. 2002).

Plaintiff further contends that he automatically obtained the right to file suit 180 days after he filed a charge with the EEOC. *See*, 42 U.S.C. § 2000e-5(f)(1). Plaintiff does not explain which of his charges this argument pertains to. Presumably, it applies to his retaliation claims for which there is no evidence that he received a notice of right to sue. As discussed above, however, these additional claims never ripened into bonafide charges. Furthermore, plaintiff's argument notwithstanding, a notice of right to sue is required before filing suit. *See, Turner v. Texas Instruments, Inc.*, 556 F.2d 1349 (5th Cir. 1977); *Zambuto v. American Tel. & Tel. Co.*, 544 F.2d 1333, 1335 (5th Cir. 1977).

Plaintiff also cannot protest that he was prejudiced by the EEOC's alleged failure to issue a right to sue notice. First, the agency likely did not issue a notice because plaintiff never perfected charges for his remaining retaliation claims. Second, the regulations unambiguously provide that the EEOC shall issue a right to sue notice after passage of 180 days *and* upon written request by the complainant. 29 C.F.R. § 1601.28(a)(1). There is no evidence that 180 days passed after the filing of a perfected charge or that plaintiff submitted a written request for the issuance of a right to sue letter.

[54] Plaintiff, however, did not advance this argument.

earlier charge.  *Gupta v. East Texas State University*, 654 F.2d 411, 413 (5th Cir. 1981); *Gottlieb*

*v. Tulane University of Louisiana*, 809 F.2d 278, 284 (5th Cir. 1987); *Carter v. South Cent. Bell*,

912 F.2d 832, 841 (5th Cir. 1990).  The policy reason behind the *Gupta* exception was to obviate

a complainant's need to file two or more charges with the EEOC.  *Gupta, supra*.  By excusing an

employee's need to file multiple charges, an employer would not be able to procedurally delay

the initial charge by committing additional retaliatory offenses.

Clearly, those concerns are not present here because plaintiff perfected one retaliation

charge with the EEOC and attempted to file several others. Unlike *Gupta*, *Gottlieb*, and *Carter*,

Lewis actually received a notice of right to sue for at least some of his retaliation claims.[55]

Moreover, he received the right to sue notice for his retaliation claims *before* the right to sue

notice was issued for his failure to hire claim.  Nonetheless, Lewis did not file suit on his

retaliation charge within the 90 day filing window.  The 90 day filing period would be rendered

meaningless if plaintiff could resurrect administratively exhausted, but time-barred claims merely

by attaching them to a subsequently issued right to sue notice.  *See, Soso Liang Lo v. Pan*

*American World Airways, Inc.*, 787 F.2d 827, 828 (2d Cir. 1986) (time limitations of 42 U.S.C. §

2000e-5(f)(1) would be meaningless if Title VII plaintiffs could evade those requirements simply

by seeking additional Notices of Right to Sue).  There is no indication that *Gupta* and its progeny

intended such a result.

There is yet another series of cases which recognizes that

> a cause of action for Title VII employment discrimination may be
> based, not only upon the specific complaints made by the
> employee's initial EEOC charge, but also upon any kind of

---

[55]  The retaliation claims which plaintiff failed to perfect with the EEOC are arguably
included within the scope of the EEOC's investigation of his perfected, but now time-barred
retaliation charge.  *See*, discussion, *infra*.

> discrimination like or related to the charge's allegations, limited
> only by the scope of the EEOC investigation that could reasonably
> be expected to grow out of the initial charges of discrimination.

*Fellows v. Universal Restaurants, Inc.*, 701 F.2d 447, 451 (5th Cir.1983) (citing *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455 (5th Cir.1970); *Gamble v. Birmingham Southern Railroad Company*, 514 F.2d 678 (5th Cir.1975)).

These cases are distinguishable for the same reason as *Gupta, et al.* Here, Lewis actually filed and exhausted an administrative charge for unlawful retaliation. There is nothing in plaintiff's failure to hire charge which would prompt the EEOC to investigate potential retaliation claims. *See, Miller v. Southwestern Bell Telephone Co.*, 2002 WL 31415083 (5th Cir. Oct. 7, 2002) (unpubl.) (lack of information that complainant sought redress for unlawful retaliation in his EEOC charge created strong presumption that complainant failed to exhaust administrative remedies); *Cassey v. Coca-Cola Enterprises*, 2006 WL 3862005 (W.D. La. Dec. 29, 2006) (no evidence in discrimination charge to cause EEOC to investigate a hostile work environment claim). Indeed, it stands to reason that Lewis's failure to hire charge would not spark an investigation of retaliation claims when the EEOC had before it a *separate* charge specifically raising retaliation claims. If anything, plaintiff's un-perfected charges stemming from his other retaliation claims would have been included within the scope of his perfected charge on retaliation. Unfortunately, plaintiff failed to timely file suit on his retaliation claims.

The undersigned further finds that the efficacy of the *Gupta* and *Fellows* decisions has been materially constrained by a recent Supreme Court decision, *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S.Ct. 2061 (2002). In *Morgan*, the Supreme Court emphasized that the filing of an EEOC charge within the specified time period is mandatory and that the litigant has up to 300 days *after* the challenged practice occurred to file an EEOC charge. *Id*. (emphasis in original). The Court identified several relevant principles,

31

> *First, discrete discriminatory acts are not actionable if time*
> *barred, even when they are related to acts alleged in timely filed*
> *charges*. Each discrete discriminatory act starts a new clock for
> filing charges alleging that act. The charge, therefore, must be filed
> within the 180- or 300-day time period after the discrete
> discriminatory act occurred. The existence of past acts and the
> employee's prior knowledge of their occurrence, however, does not
> bar employees from filing charges about related discrete acts so
> long as the acts are independently discriminatory and charges
> addressing those acts are themselves timely filed.

*Morgan*, 536 U.S. at 113, 122 S.Ct. at 2072 (emphasis added).

The court went on to state that "[e]ach incident of discrimination and each retaliatory adverse

employment decision constitutes a separate actionable 'unlawful employment practice.'"

*Morgan, supra*.  An employee can only file a charge to cover discrete acts that "occurred" within

the appropriate time period.  *Id*.  Importantly, only those acts that occurred 300 days *before* the

date the employee filed his charge are actionable.  *Id*. (emphasis added).

    Applying the foregoing principles here, it is apparent that plaintiff's failure to hire charge

cannot be used to save his retaliation claims.  Lewis perfected his failure to hire charge on June

2, 2005, but his earliest retaliation claims did not occur until June 9, 2005.  *See*, Charge Numbers

270-2005-0344 & 270-2005-05246, Def. Exh. 49-1.  Moreover, each claim of retaliation was

arguably a discrete discriminatory act which required a separate charge.  *See, Morgan, supra*.[56]

---

[56]  The undersigned did not find any Fifth Circuit decisions that have considered
*Morgan*'s effect on *Gupta* or *Fellows*.  Other courts have expressed diverging opinions.  *See,*
*Griggs v. University Health System*,  2007 WL 708608 (W.D. Tex. Mar. 7, 2007) (and cases
cited therein) (continued to apply *Gupta*); *Adams v. Mineta*,  2006 WL 367895 (D.D.C. Feb. 16,
2006) (and cases cited therein) ("in the wake of *Morgan*, a plaintiff must first exhaust her
administrative remedies before filing a [sic] action in federal court alleging retaliation in
violation of Title VII").  The cases which found that *Morgan* did not affect *Gupta, et al*
essentially limited *Morgan* to disqualifying untimely pre-charge retaliatory acts, not exhaustion
of post-charge, timely retaliatory acts.  *See, Griggs, supra*.  While those courts may have
correctly summarized the issue before the Court in *Morgan*, the Supreme Court decision
nonetheless contains broad and sweeping language.  *See, Adams, supra*.

In sum, plaintiff's retaliation claims set forth in Charge Number 270-2005-05246 are time-barred for failure to file suit within 90 days after receipt of the EEOC's right to sue notice. Plaintiff's remaining retaliation claims are subject to dismissal for failure to exhaust administrative remedies.  *Hoffman*, 596 F.2d at 685 (complaint that fails to allege exhaustion of administrative remedies or that plaintiff should for some adequate reason be excused from this requirement is properly subject to dismissal) (citations omitted).[57]

### b) Merits

Having determined that plaintiff's retaliation claims are time-barred, the court need not reach the merits of the retaliation claims.  However, due to the nebulous status of plaintiff's retaliation claims, their untimeliness may be challenged upon appeal.  Accordingly, the undersigned shall conditionally address the merits of plaintiff's retaliation claims in the event that he subsequently establishes the timeliness of one or more of his claims.

Title VII's anti-retaliation provision states that

> [i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).

Under Title VII, a plaintiff may prove retaliation either by direct or circumstantial evidence.

---

[57]  Alternatively, to the extent that plaintiff's remaining retaliation claims were included within the scope of the EEOC's investigation of his first retaliation charge, they are barred by the 90 day period to file suit.

Logically, dismissal for failure to exhaust administrative remedies should be without prejudice.  However, because more than 300 days have elapsed since the challenged actions occurred, it is now too late to present those claims to the EEOC.  *See, Hood v. Sears Roebuck and Co.*,  168 F.3d 231, 233 (5th Cir. 1999) (suit dismissed for failure to timely file EEOC charge).

*McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir.2007).  When, as here, plaintiff relies upon circumstantial evidence, the case is analyzed under the familiar *McDonnell Douglas Corp. v. Green* burden-shifting framework.  *Lemaire v. Louisiana Dept. of Transp. and Development*, 480 F.3d 383, 388 (5th Cir. 2007) (citations omitted).  Under the test, plaintiff must first establish a prima facie case of retaliation.  He must show that "(1) he engaged in an activity that Title VII protects; (2) he was subjected to an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse employment action." *Id*.[58]  If the plaintiff meets his prima facie burden, then the employer must state a legitimate, non-retaliatory basis for its decision.  *Id*.  Once the employer states its reason, the burden returns to the employee to demonstrate that the proffered reason was actually a pretext for discrimination.  *Id*.

Lewis alleges that the retaliation began after he filed his first discrimination charge with the EEOC.  Filing an EEOC charge is clearly a protected activity.  *See, Dollis v. Rubin*, 77 F.3d 777, 781 (5th Cir. 1995).  Thus, plaintiff has met the first element of his prima facie case.  The court's focus will be upon the remaining elements of plaintiff's prima facie case and the ensuing steps of the burden-shifting framework.

1) June 7, 2005, Letter of Guidance

Plaintiff alleges that on June 9, 2005, he received a written letter of guidance dated June 7, 2005, from Chief Tornabene.  (*See*, February 28, 2006, Discrimination Charge; Def. Exh. 49-1 [doc. # 58]).  The document lists several deficiencies in plaintiff's work performance and institutes remedies.  (Pl. Memo., Exhs. [doc. # 57]).  The letter specified that Lewis was to work from 0800 to 1700, with a one hour lunch period from 1200-1300; except for lunch or training,

_____

[58]  To establish the "causal link," plaintiff need not establish that his protected activity was the sole factor motivating the employer's challenged decision.  *Long v. Eastfield College*, 88 F.3d 300, 305 n4 (5th Cir. 1996).

34

he could no longer leave the station without authorization by the fire chief; he had to post

detailed training schedules in advance; and his EMS duties were turned over to Tommy Woods.

*Id.*[59]

Plaintiff contends that the EEOC notified the city and Chief Tornabene of his

discrimination complaint in April 2005 when he first initiated the complaint process.  However,

the city has adduced evidence that it did not know about plaintiff's discrimination charge until it

first received notice from the EEOC on June 13, 2005.  (Hollingsworth Affidavit, Def. Exh. 45;

Pat Cargill Affidavit, Def. Exh. 49).  Chief Tornabene was not aware that Lewis had filed an

EEOC charge when he drafted the letter of guidance on June 7, 2005, or when he gave the letter

to Lewis on June 9, 2005.  (Tornabene Aff., Def. Exh. 50).[60]  Plaintiff's sole basis for arguing

that the city knew about his charge in April or early May 2005 is his belief that the EEOC served

the notice upon the city within 10 days after Lewis initiated his complaint.  *See e.g.*, Pl. Memo.,

pg. 2 [doc. # 57]; 29 C.F.R. § 1601.14.  However, an April 29, 2005, letter from the EEOC to

Lewis regarding Charge Number 270-2005-03445 clearly stated,

> [p]lease review the enclosed charge.  If it meets with your approval
> please sign and return the charge in the enclosed envelope.  *A copy
> of the charge or notice of the charge will be sent to the respondent
> within 10 days of our receipt of the signed charge as required by
> our procedures.*

(Pl. Memo., Exhs. [doc. # 57]) (emphasis added).

---

[59]  In his latest filing with the court, plaintiff submitted an Explanation of Deficiencies
and Remedies Dated 6/7/2005 which was evidently written by Chief Tornabene.  (*See*, [doc. #
59]).  Plaintiff represents, without proper authentication, that he received the document from the
EEOC as an attachment to the June 7, 2005, written guidance.  Plaintiff argues that defendant
should have produced the document in discovery.  Be that as it may, the Explanation does no
more than reiterate Tornabene's reasons for issuing the written guidance.  Plaintiff has not
demonstrated any prejudice by its non-disclosure.

[60]  Tornabene did not learn of the charge until sometime after June 13, 2005.  *Id.*

35

In his subsequent retaliation charge, Lewis declared under penalty of perjury that he did not sign and mail Charge Number 270-2005-03445 to the EEOC until June 8, 2005.  (Def. Memo., Exh. 49-1 [doc. # 58]).  The EEOC thereafter sent notice of the charge to the city.  The city did not receive the charge until June 13, 2005.  Accordingly, to the extent that the written guidance and the remedies set forth therein (inability to leave station unless authorized; lunch from 1200 to 1300; requirement to post detailed training schedule in advance; and transfer of EMS training duties to someone else) constitute adverse employment actions, plaintiff cannot demonstrate the requisite causal connection with his protected activity because the city and Chief Tornabene were not aware that he had filed a charge with the EEOC at the time of the alleged adverse actions. *Manning v. Chevron Chemical Co., LLC*, 332 F.3d 874, 883 (5th Cir. 2003) (to establish causation, the employee must at least show that the employer knew about the employee's protected activity); *Watkins v. Texas Dept. of Criminal Justice*, 2008 WL 686571 (5th Cir. Mar. 12, 2008) (unpubl.) (actions not retaliatory because they predated complainant's participation in any protected activity); *DeHart v. Baker Hughes Oilfield Operations, Inc.*,  214 Fed. Appx. 437, 442 (5th Cir. 2007) (unpubl.) (no causal link where adverse action preceded participation in protected activity).  Accordingly, plaintiff has failed to establish a prima facie case for these retaliation claims.

    2) Job Title

    Lewis contends that Chief Tornabene removed "Chief" from his title as "Training Officer."  In his memoranda, plaintiff argues that this alleged retaliatory act occurred on May 23, 2005.  (Pl. Memo., pg. 2 [doc. # 57]; Pl. Memo., pg. 5 [doc. # 59]).  If so, then the retaliatory act occurred before Chief Tornabene was aware of plaintiff's EEOC charge, and there is no causal link.  *See, Watkins, supra*.  However, Chief Tornabene stated that he restricted the use of "Chief"

during a July 8, 2005, meeting.  (Tornabene Aff., Def. Exh. 50).  For purposes of this motion, the court will accept the evidence which favors the non-movant and find that Tornabene did not restrict the use of the "Chief" modifier until July 8, 2005.  Moreover, since the alleged title change occurred less than one month after the city and Chief Tornabene learned of plaintiff's filing with the EEOC, the timing is sufficiently close to establish a causal connection.  *Swanson v. General Services Admin*., 110 F.3d 1180, 1188 (5th Cir. 1997) (citation omitted) ("[c]lose timing between an employee's protected activity and an adverse action against him may provide the 'causal connection' required to make out a prima facie case of retaliation).[61]

The remaining element of plaintiff's prima facie case is whether his job title change constituted a cognizable adverse employment action.  In *Burlington Northern & Santa Fe Railway Co. v. White*, the Supreme Court stated that "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington Northern and Santa Fe Ry. Co. v. White*,  548 U.S. 53, 126 S.Ct. 2405, 2415 (2006) (internal quotation marks omitted).  Whether a particular action is materially adverse "depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances."  *Id*.  (internal quotations marks omitted).

In the instant case, Chief Tornabene stated that it had become customary for members of the fire department to refer to each other as "Chief," and that this practice created confusion.  (Tornabene Affidavit, Def. Exh. 50).  He further stated that he wanted to comply with the official

---

[61] *See, Clark County School Dist. v. Breeden*, 532 U.S. 268, 121, S.Ct. 1508 (2001) (cases that accept mere temporal proximity to establish causality hold that the temporal proximity must be "very close").

job titles set forth in the Civil Service job descriptions.  *Id*.

Plaintiff concedes that the Civil Service job title for his position is "Training Officer" without the "Chief" designation.  (Pl. Depo., pgs. 149-150).  However, he emphasizes that he inherited the "Chief" appellation from his predecessor.  *Id*. at pgs. 148, 150.  Lewis also identified a January/February 2005, organizational chart issued by interim fire chief Harrell Pipes which included the "Chief" designation.  (Pl. Exh. L).  Nonetheless, Lewis admits that the alleged job title change did not affect his pay, benefits, schedule, promotional opportunities or anything else.  (Pl. Depo., pgs. 150).

The undersigned is not persuaded that a reasonable person who had been customarily accorded the title, "Chief" would have found materially adverse a directive prohibiting the use of the modifier in his title when the procedural change merely brought the job title in compliance with the official Civil Service title.  Plaintiff has not adduced any appointment records or job description records to indicate that his official title was anything other than "Training Officer." Moreover, it stands to reason that Lewis's title not include "Chief" because the name implies that there are other training officers whom he presides over.  Yet, the fire department flow chart confirms that there are no other training officers or personnel directly beneath the "Training Officer."  (*See*, Exh. to Pl. Depo., Def. Exhs. [doc. # 23]).  The "chief" designation was redundant.  Plaintiff has not met his prima facie burden.[62]

3) <u>Posting of Seniority List and Suspensions</u>

In early August 2005, Chief Tornabene instructed the Secretary for the Ruston Fire Department, JoAnn Barr, to post an employee seniority list.  (*See*, Tornabene and Barr

---

[62]  To the extent that the analysis of plaintiff's prima facie case overlaps with defendant's non-discriminatory rationale, the undersigned finds that the claim may be properly denied at that step.

Affidavits; Def. Exhs. 50-51).  On August 11, 2005, Barr posted the seniority list on the bulletin

board, but mistakenly included the employees' suspension history.  (Barr Affidavit, Def. Exh.

51).[63]  Plaintiff contends that the posting was retaliatory.

     To the extent that plaintiff contends that posting the seniority list itself was an adverse

employment action, the undersigned emphasizes that the Civil Service Board recommends

posting the seniority list at least once per year.  (Pl. Exh. M).  Accordingly, a reasonable worker

would not have found Chief Tornabene's decision to post the seniority list materially adverse.

Moreover, assuming that posting Lewis's suspension history was an adverse employment action

causally related to a protected activity, the city has proffered a legitimate non-discriminatory

reason for the posting:  an unintentional mistake by the secretary.  Indeed, the city did not post

solely plaintiff's suspension history, it posted all of the employees' suspensions.  (*See*, Pl.

Memo., Exhs. [doc. # 57].  Plaintiff did not offer evidence to contradict defendant's explanation

or to otherwise demonstrate pretext.  Thus, plaintiff's claim fails.

     4) Burn Tower Incident

     On October 26, 2005, Chief Tornabene received e-mails from two members of the

Lincoln Parish Fire Department, Fire Chief Dennis Ford and William Millsaps.  (Tornabene Aff.,

Def. Exhs. 50, 50-7, 50-8).  They stated that on October 25, 2005, they observed Terry Lewis

conducting a live training exercise at the burn tower.  *Id.*  They mentioned to Lewis that due to

the intense heat and smoke, they thought that the door to the burn box needed to be closed.  *Id.*

---

    [63]  The seniority list was compiled as a Microsoft Excel document.  *Id.*  The Excel
spreadsheet included the employees' suspension history.  *Id.*  Barr originally printed the seniority
list without the suspension column, but had to re-print it due to an error with an employee
identification number.  *Id.*  She fixed the error, but forgot to suppress the suspension column
when she re-printed the list.  *Id.*  On August 12, 2005, it came to Barr's attention that she had
posted the suspension column.  *Id.*  She immediately replaced the seniority list without the
suspension history.  *Id.*

Lewis acknowledged the comment, but then simply walked around to the other side of the building.  *Id.*  The next day, Chief Ford observed that the building's metal studs had been warped, a lot of paint had been scorched, floor joists were damaged, and the concrete was badly spalled.  *Id.*

After receiving reports of the burn tower damage ostensibly caused by Lewis, Tornabene ordered Lewis to undergo a drug test, and assigned him to the alarm room as a dispatcher for two weeks while the incident was under investigation.  (Tornabene Aff., Def. Exh. 50).[64]  After two weeks, the investigation did not reveal a clear and concrete violation by Lewis.  *Id.*  With the exception of supervising "live burn" training exercises, Lewis returned to his normal duties.  *Id.*

Plaintiff contends that having to undergo a drug test and temporary reassignment were retaliatory.  Assuming, without deciding, that these acts constitute adverse employment actions,[65] the undersigned finds that Chief Tornabene was aware that plaintiff had filed a discrimination charge with the EEOC.  This knowledge suffices to establish a causal link with plaintiff's protected activity.  (Tornabene affidavit).[66]

---

[64]  The drug test was negative.  *Id.*

[65]  In *McCoy v. City of Shreveport*, the Fifth Circuit left open the question of whether paid administrative leave could constitute an adverse employment action.  *McCoy v. City of Shreveport*, 492 F.3d 551, 560-561 (5th Cir. 2007).

[66]  Cases hold that a "'causal link' is established when the evidence demonstrates that 'the employer's decision to terminate was based in part on knowledge of the employee's protected activity.'"  *Medina v. Ramsey Steel Co., Inc.*, 238 F.3d 674, 684 (5th Cir. 2001) (citation omitted); *Jacobi v. Federal Exp. Services Corp.*, 2005 WL 1645774 (W.D. La. Jul. 13, 2005). In *Medina*, the employer's decision maker knew about the employee's complaint to the state agency.  *Medina, supra.*  The court held that this knowledge sufficed to establish a causal link.  *Id.  But see, Knights v. Bank United of Texas Federal Savings Bank*, 192 F.3d 127 (5th Cir. Aug. 13, 1999) (unpubl.) ("Mere knowledge of possible protected activity is not enough to raise a fact issue on the necessary causal link for a retaliation claim."); *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74, 121 S.Ct. 1508 (2001) (court assumed that employer had knowledge of

Even though plaintiff arguably met his  prima facie burden regarding these claims, he adduced no evidence to undermine defendant's proffered rationale for subjecting him to a drug test and temporary reassignment pending the results of the investigation.  *See, Watkins, supra* (plaintiff failed to rebut defendant's legitimate, non-discriminatory reasons for the investigation and one month probation).  Indeed, it is uncontroverted that drug tests were administered to fire department personnel who were involved in accidents, injuries, or damage to property. (Tornabene Aff., Def. Exh. 50).  Moreover, there is no evidence that Chief Tornabene treated Lewis differently from any similarly situated worker when he assigned him to the alarm room during the investigation, rather than placing him on administrative leave.

In connection with the burn tower incident, plaintiff claims that the mayor expressed his concern about the tower damage in his weekly letter to the City of Ruston Board of Aldermen. (Pl. Depo., pgs. 293-294, Def. Exh.).  Plaintiff has not produced the letter or even seen it.  He relies on a conversation that he had with Alderman Mayfield from which Lewis gathered that the mayor was ready to fire him. (Pl. Depo., pgs. 293-294, Def. Exh.).  Aside from plaintiff's failure to adduce any admissible evidence to establish this claim, if the mayor issued the letter while Lewis was still being investigated for damage to the burn tower, he had a reasonable basis for being displeased with Lewis in light of the accusations made by Lincoln Parish Fire Chief Ford. *See*, discussion, *supra*.  Accordingly, plaintiff has not sustained his burden.

5) Gathering Training Documents

In 2005, Chief Tornabene received notice that an insurance entity would be reviewing the city's insurance rating.  (Tornabene Aff., Def. Exh. 50).  Tornabene wanted to ensure that their computer records matched the hard copy records.  *Id*.  Tornabene asked Lewis for the records,

---

protected activity, yet found no causation due to lack of temporal proximity).

but Lewis told him that the previous fire chief had told him to destroy the records.  *Id.*[67]  It is not readily apparent how a request for records can be considered an adverse employment action.  There is no evidence that Lewis suffered any consequences.  Plaintiff has not met his prima facie burden.

6) Removal from Interview Committee

On, or about January 3, 2006, Chief Tornabene revised the composition of the hiring committee for new firefighter applicants.  (Tornabene Aff., Def. Exh. 50; Pl. Memo., Exhs. [doc. # 50]).  The revision resulted in plaintiff and his cousin, Jerry Lewis, being removed from the committee.  (*See*, Tornabene Aff).  As a result, there were no blacks on the new committee.  (Pl. Depo., pg. 237, Pl. Exh.).  Plaintiff's removal from a committee which apparently helped render hiring decisions can be objectively perceived as a materially adverse employment action.  Moreover, Chief Tornabene's knowledge that plaintiff filed a charge with the EEOC satisfies the causal element of plaintiff's prima facie case.  *See*, discussion, *supra*.

Chief Tornabene's proffered rationale for revising the hiring committee was to create a more "representative group of individuals to conduct the interviews."  (Tornabene Aff.; Def. Exh. 50).  However, the revision actually resulted in a lack of minority representation on the committee.  This inconsistency between defendant's stated rationale and the result achieved suffices to raise a fact issue regarding defendant's motivation.  Accordingly, this retaliation claim, if timely, would have survived summary judgment.[68]

---

[67]  Plaintiff did make some copies of training records for Tornabene.  (Pl. Depo. Pg. 295, Def. Exh.).

[68]  In conjunction with this claim, plaintiff also alleged that he believed that his office had been bugged.  (Pl. EEOC Questionnaire, Exh. to [doc. # 57]).  During his deposition, however, plaintiff specifically disclaimed that bugging was one of his retaliation claims.  (Pl. Depo., pg. 193; Def. Exh.).

42

7) Denial of IFSAC Re-certification

Plaintiff alleges that Chief Tornabene denied his request to attend an International Fire

Service Accreditation Congress ("IFSAC") course at LSU.  (Pl. Depo., pgs. 309-311, Pl. Exh.).[69]

Instead, Chief Tornabene decided to attend the course himself.  *Id*.  Plaintiff suggests that due to

his lost certification, he can no longer handle training in those areas.  *Id*.  Plaintiff's

marginalization can be objectively construed as a materially adverse action.  Plaintiff has also

established the causal element of his prima facie case via Tornabene's knowledge of his

protected activity.  *Medina, supra*.  In response to plaintiff's prima facie case, defendant has not

proffered any rationale for refusing to permit the RFD's Training Officer to retain his

certification.  (*See e.g.*, Def. Reply Memo., pgs. 13-14 [doc. # 37]).  Accordingly, this retaliation

claim, if timely, would have survived summary judgment.

8) Calling for a Competitive Examination

In June 2006, Chief Tornabene called for civil service examinations to be held for

plaintiff's Training Officer position and the position of Public Education Officer.  (Tornabene

Aff., Def. Exh. 50).  Tornabene did so because both incumbents were eligible for retirement, and

he wanted to be able to quickly select their replacements.  *Id*.[70]  Nonetheless, it is not a stretch to

find that a reasonable worker would be chilled from engaging in protected activity when his

employer essentially starts taking applications for his position.[71]  Further, there is a causal link

between the protected activity and the adverse employment action due to Tornabene's awareness

---

[69]   It is unclear from the record when this event occurred or whether plaintiff submitted the issue to the EEOC.

[70]   The examination test scores are valid for 18 months.  *Id*.

[71]   In fact, plaintiff's cousin, Jerry Lewis arguably saw the writing on the wall and elected to retire from his Public Education Officer position.  (*See*, Tornabene Aff.).

that plaintiff had filed an EEOC charge. *See*, discussion, *supra*.[72]

Chief Tornabene contends that the pre-vacancy scheduling of civil service examinations allowed replacements to receive on-the-job training before the incumbent retired. (Tornabene Aff.). Tornabene noted that Jerry Lewis's replacement was able to train with him prior to Lewis's retirement. *Id*. However, Tornabene's affidavit and letter of guidance are replete with allegations that plaintiff was not performing his job properly and was undermining department morale. *Id*. Clearly, Tornabene would not have wanted Terry Lewis to pass on his bad techniques or work habits to his successor.[73] This inconsistency undermines defendant's proffered rationale and strongly suggests that defendant's explanation was merely a pretext for retaliation.[74] Again, this claim would have survived summary judgment on the merits, if it had been timely filed.

9) Proposed Consolidation of Positions

Plaintiff alleges that Chief Tornabene recently asked him to justify why the positions of Public Education Officer and Training Officer should not be combined. (Pl. Depo., pg. 307, Pl. Exh.). Without more, however, this request does not establish a materially adverse employment action. If plaintiff were to remain in the combined position, it is not evident that the additional

---

[72] Although not discussed by the parties, the undersigned observes that plaintiff signed his EEOC retaliation charge on February 28, 2006. (Def. Memo., Exhs. [doc. # 58]). The EEOC seems to have received the signed charge on March 10, 2006. *Id*. Under EEOC regulations, the agency would have notified the city of the charge within ten days thereafter. The parties do not address whether or when the city received notice of this charge.

[73] Plaintiff also adduced evidence that the department had never advertised for positions before they were vacated or before the incumbent announced his intention to vacate the position. (Pl. Depo., pg. 299, Pl. Exh.).

[74] If the procedure was in fact implemented to prompt plaintiff and his cousin to retire, it partially achieved its intended result when Jerry Lewis retired.

job duties and potentially greater salary would objectively dissuade a worker from filing an EEOC charge.  Accordingly, plaintiff has not met his prima facie burden.

In sum, should the court reach the merits of plaintiff's retaliation claims, it is recommended that all be dismissed, except for the claims challenging 1) plaintiff's removal from the interview committee; 2) the denial of IFSAC re-certification; and 3) the call for a competitive examination for plaintiff's position.

For the above-assigned reasons,

IT IS RECOMMENDED that the motion for summary judgment [doc. # 23] filed by defendants, City of Ruston and Mayor Dan Hollingsworth, be GRANTED IN PART, DISMISSING WITH PREJUDICE plaintiff, Terry R. Lewis's claims, in their entirety, against Mayor Dan Hollingsworth and DISMISSING WITH PREJUDICE as time-barred, plaintiff, Terry R. Lewis's claims for unlawful retaliation against the City of Ruston.

IT IS FURTHER RECOMMENDED that the motion for summary judgment [doc. # 23] filed by defendants, City of Ruston and Mayor Dan Hollingsworth, be DENIED insofar as the motion seeks dismissal of plaintiff's failure to hire claim against the City of Ruston.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and F.R.C.P. Rule 72(b), the parties have **ten (10) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **ten (10) business days** after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED**

45

**FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Monroe, Louisiana, this 23rd day of April, 2008.

KAREN L. HAYES
U. S. MAGISTRATE JUDGE

46